**Electronically Filed**
**Intermediate Court of Appeals**
**CAAP-18-0000137**
**12-FEB-2019**
**08:25 AM**

NO. CAAP-18-0000137

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI


STATE OF HAWAIʻI, Plaintiff-Appellee,
v.
CRAIG CONKLIN, Defendant-Appellant,

APPEAL FROM THE CIRCUIT COURT OF THE THIRD CIRCUIT
(CR. NO. 3CPC-17-0000287)

MEMORANDUM OPINION
(By: Ginoza, Chief Judge, Fujise and Hiraoka, JJ.)


Defendant-Appellant Craig Conklin (**Conklin**) appeals from the Judgment of Conviction and Sentence (**Judgment**) entered by the Circuit Court of the Third Circuit (**Circuit Court**)[1] on January 9, 2018. Conklin contends that the Circuit Court erred by:

1. sentencing him based on Hawaii Revised Statutes (**HRS**) §§ 706-621 and 706-626 (2014) rather than HRS § 706-606 (2014); and

2. ruling that his Sixth Amendment right to counsel was not violated.

Upon careful review of the record and the briefs submitted by the parties and having given due consideration to the arguments advanced and the issues raised, as well as the relevant statutory and case law, we affirm the Judgment.


**I.**


On December 14, 2016, Conklin was driving a car while his dog (**Pete**) walked alongside. Edwin Hart (**Hart**) and Diane

---

[1] The Honorable Melvin H. Fujino presided.

Kang (**Kang**) were walking their own dogs on the road outside their residence. One of their dogs (**Kahi**) started fighting with Pete. Kahi chased Pete up the road. The dogs stopped when an oncoming truck shone its headlights on them. The truck stopped. Conklin drove his vehicle toward the dogs and struck Kahi. Conklin left the scene with Pete, sideswiping the truck in the process. Kahi died.

Hart called the police to report that his dog had been run over. Officer Douglas Phillips (**Officer Phillips**) responded. While Officer Phillips was taking statements from Hart and Kang, dispatch informed him that another person wanted to meet with a police officer about the same incident. Officer Phillips made contact with Conklin the same night. Officer Phillips told Conklin he had already talked to Hart and needed to read Conklin his constitutional rights. After being read his rights, Conklin told Officer Phillips he was hitchhiking with his dog and had been picked up by someone. Conklin said he was in the other person's car with his arm hanging out, walking the dog. When they approached Hart's property, Hart's dog attacked his dog and both dogs ran up the road.

On May 4, 2017, Conklin was indicted for Cruelty to Animals in the First Degree in violation of HRS § 711-1108.5[(1)](a) and/or (b) (2014).[2] Conklin was arraigned on June 9, 2017, and entered a plea of not guilty.

Jury trial was to begin on Tuesday, October 10, 2017. On the Friday before the trial Conklin called the police to report an unrelated incident. Officer Augustine Akiu (**Officer**

---

[2]     HRS § 711-1108.5 provides, in relevant part:

> (1)    A person commits the offense of cruelty to animals in the first degree if the person intentionally or knowingly:
>
>> (a)    Tortures, mutilates, or poisons or causes the torture, mutilation, or poisoning of any pet animal or equine animal resulting in serious bodily injury or death of the pet animal or equine animal; or
>>
>> (b)    Kills or attempts to kill any pet animal belonging to another person, without first obtaining legal authority or the consent of the pet animal's owner.

**Akiu**) was assigned to respond to Conklin's residence. Officer Phillips was also on duty that night, and responded as Officer Akiu's back up. After Officer Akiu obtained information from Conklin, Conklin told Officer Phillips, "We'll see each other next week." Officer Phillips told Conklin, "Yes, I would see him Tuesday." Conklin then said "that he was sorry about lying and that he was driving the car and he felt scared and that's the reason why he lied."

On the morning of the trial, the State disclosed that it intended to use Conklin's statement to Officer Phillips during the trial. The Circuit Court conducted an evidentiary hearing to determine whether Conklin's statement was voluntarily made. Officer Phillips testified, and was cross-examined by Conklin's defense attorney. After hearing arguments from counsel, the court ruled:

> Court will find that on October 6, 2017, Officer Doug Phillips and Officer Augustine Akiu were employed with the Hawaii County Police Department. That Officer Douglas Phillips responded with Officer Augustine Akiu to defendant Craig Conklin's residence. And that Officer Augustine was the investigator regarding the report by the Defendant regarding a terroristic threatening case. That the Defendant initiated the conversation with Officer Doug Phillips and said words to the effects, "I guess we'll see each other in court next week." Thereafter Officer Phillips responded that, "Yes, they'll be -- see him next week" or words to that effect. And thereafter Defendant made statements without questions by the officer, by Officer Phillips regarding words to the effect that he feels bad about lying to you that he was driving the car, and he was scared, shouldn't have lied to the officer.
>
> Conclusions of law, while the Defendant was represented by counsel in the present case, the Officer responded to the Defendant's residence and was not the lead investigator. And did not -- for <u>Miranda</u> to imply -- apply there has to be interrogation and in custody. So the Court will find there is no interrogation by the Officer Phillips of the Defendant either in the terroristic threatening case or the instant case. And that the Defendant made spontaneous statements to the Officer without any interrogation by the Officer.
>
> State may use these statements at trial subject to the proper foundation being established.
>
> . . . .
>
> And the Court -- just to clarify, the Court's finding is that there was no interrogation, therefore no violation of [the] Sixth Amendment right as well.

During trial the State called Hart, Kang, Officer Phillips and Felicia Welker (**Welker**) (the driver of the truck that had stopped). Hart testified that after the dogs started to fight, Conklin got out of his car "and he was yelling loud." Hart said, "I'm going to call the police." Hart testified that Conklin said, "You call the police and I'll run your F'n dog over." According to Hart:

> Well after he told me he was going to run over my dog, he threw whatever he had in his hand under his seat, slammed the car door. And my dog by then had already chased -- one of my dogs, Kahi girl, chased his dog off of our block and she was coming back home. She sat down in front of another car coming down the hill. And she just sat there and waited. And this man here drove straight up to her, who was over 100 feet away, crossed the yellow line, ran over Kahi while she was sitting there. Put his car in reverse, ran back over her. Screeching his tires, errr, boom. And then almost hitting another car that was -- she was sitting right in front of. And he left the scene as fast as I could hear the motor running.

Kang testified that she also heard Conklin tell Hart, "You call the police, I'm going to run over your dog." Welker testified that she was blinded by headlights – apparently from Conklin's vehicle – and could not identify the driver of the car that hit her truck, but testified she only saw one silhouette in the car. Officer Phillips testified that he contacted Conklin at Conklin's residence. Conklin stated that he had been hitchhiking and had been picked up by someone, and he was not the driver. While Officer Phillips was interviewing Conklin, Pete was attacked by another dog. Conklin got upset and asked Officer Phillips to shoot the other dog. Officer Phillips did not think it was safe to even draw his weapon because Conklin and an elderly woman were in the area. At the conclusion of his direct examination, Officer Phillips was asked about the statement made by Conklin "last Friday." Officer Phillips testified, "He stated that he felt bad that he had lied to me about driving the car that night, and that he was the driver of the car."

After the Circuit Court denied Conklin's motion for judgment of acquittal, Conklin was the only witness called by the defense. He testified that he was driving, with Pete walking alongside his vehicle, as they approached Hart and Kang and their dogs.

> Well about a second after I say "how's it" to Mr. Hart, and I get the cold blank stare, I hear what I thought was a word, something audible by Mr. Hart. And within a split second I hear my dog yelp out. A cry for help, "yipe." Obviously heard. Something is wrong. I look in my passenger mirror and the dog is behind my car maybe a body length, and I noticed that there's a Pit Bull hanging on his neck. Within a split second of this audible command.

Conklin testified that Hart said, "Fuck you, haole. You got some set of balls bringing your dog on my street. This is your lessen [sic], it's time you were taught." Conklin testified that Hart and Kang were "yelling racial epitaphs [sic] and slurs, trying to get me into some heated altercation." According to Conklin, Pete ran up the road with Kahi "still latched on" to Pete's neck. He drove after the dogs. A truck turned onto the road and Kahi let go of Pete's neck when the headlights shone on them. Conklin swerved to avoid Pete, who was in Conklin's lane, and struck Kahi with his car. He denied trying to kill Kahi. He denied hitting Welker's truck. He put Pete in his car, drove home, and called 911. Conklin also explained why he told Officer Phillips that someone else was driving the car:

> [CONKLIN]: . . . I was scared, I didn't know what was going to happen. I thought that the Harts would be after me in their vehicle. I was just panicked and I was in a state of confusion, I didn't know what to do. This is not something that happens every day. I don't fight dogs, I don't fight in general. This was very disturbing.
>
> [DEFENSE COUNSEL]: At a later date did you admit to the Officer Phillips that you were the driver of the car?
>
> [CONKLIN]: I did. In casual conversation I thanked him for being a police officer and I apologized for -- for saying that. I told him I was scared, I didn't know what to do.
>
> [DEFENSE COUNSEL]: And you did admit to being the driver of --
>
> [CONKLIN]: Yes, I did.

The State called Kang as a rebuttal witness. She testified that she and Hart got Kahi when Kahi was three months old, denied that she or Hart trained Kahi to attack on command, and denied that either of them instructed Kahi to attack anyone or another dog on the date in question. On October 11, 2017, the

jury found Conklin guilty as charged of cruelty to animals in the first degree.

A presentence investigation (**PSI**) report was prepared and approved on December 29, 2017.[3] It provided sentencing alternatives pursuant to HRS § 706-660 and analyzed the factors set forth in HRS §§ 706-606 and 706-621. The sentencing hearing was conducted on January 9, 2018. Conklin had no corrections or additions to make to the PSI. The State requested a prison sentence. Referring to the PSI, Conklin's defense counsel requested "probation with either house arrest or community service." After Conklin addressed the Circuit Court, the court stated:

> I'm the judge that sat over this jury trial. The jurors of your peer [sic] found you guilty of the offense of Cruelty to Animals in the First Degree.
>
> The Court will receive the pre-sentence investigative report, keep it under seal. Considering the factors in Section 706-621 and Section 706-626 it is the judgment and sentence of this Court that you be committed for an indeterminate period of five years to the Department of Public Safety. You'll be given credit for one day.
>
> As to the $105 Crime Victim Compensation Fee the Court would waive that, find that you don't have the ability to pay. Mittimus to issue forthwith.
>
> Also pursuant to Section 711-1108.5(5) you are not permitted to own any -- you're prohibited from possessing, owning any pet animal or equine animal for a minimum of five years from the date of conviction which is today.

## II.

### A.    Sentencing

Conklin first contends that the Circuit Court erred in sentencing him based on HRS §§ 706-621 and 706-626 rather than HRS § 706-606.

---

[3]    Conklin argues that the Circuit Court did not actually read the PSI before sentencing him on January 9, 2018, because the court stated it "will receive" the PSI. The record is clear that the court and all parties had received and read the December 29, 2017 PSI before – or as to Conklin, during – the January 9, 2018 sentencing hearing even though it was not filed by the court until January 16, 2018. During the sentencing hearing the Circuit Court mentioned specific information contained in the PSI – for example, whether Conklin's dog had been certified as a service animal. Thus the record shows that the court had reviewed the PSI before the hearing.

Section 706-621 is titled "Factors to be considered in imposing a term of probation." Since Conklin had requested "probation with either house arrest or community service" it was not error for the Circuit Court to consider § 706-621.

Section 706-626 is titled "Summons or arrest of defendant on probation; commitment without bail." It contains no factors for sentencing. Section 706-606 is titled "Factors to be considered in imposing a sentence." The § 706-606 factors were addressed by the PSI. It appears that the court mistakenly said "626" instead of "606."

> "A sentencing judge generally has broad discretion in imposing a sentence. The applicable standard of review for sentencing or resentencing matters is whether the court committed plain and manifest abuse of discretion in its decision. Factors which indicate a plain and manifest abuse of discretion are arbitrary or capricious action by the judge and a rigid refusal to consider the defendant's contentions. And, generally, to constitute an abuse it must appear that the court clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant."

State v. Kahapea, 111 Hawai'i 267, 278, 141 P.3d 440, 451 (2006) (format altered) (citations and original alterations omitted).

The Circuit Court imposed an indeterminate five-year prison sentence. The PSI mentioned imprisonment for five years as one of the sentencing alternatives. The sentence was legal because cruelty to animals in the first degree is a class C felony. HRS § 711-1108.5(5). Commission of a class C felony is punishable by imprisonment for up to five years. HRS § 707-660(1)(b). The PSI also included a section regarding the factors in HRS § 706-606. The trial transcript reveals significant discrepancies between the version of events testified to by Hart, Kang, Welker, and Officer Phillips, and that testified to by Conklin. The jury did not believe Conklin. The nature of the statements made by Conklin during his allocution were consistent with specific concerns reported in the PSI. The Circuit Court's decision to waive the Crime Victim Compensation Fee because of Conklin's inability to pay is also consistent with information contained in the PSI. Based upon our review of the trial transcript, the PSI, and the transcript of the sentencing hearing, we hold that the Circuit Court did not abuse its

7

discretion in imposing an indeterminate five-year prison
sentence.

B.    **Sixth Amendment Right to Counsel**

Conklin next contends that the Circuit Court erred when
it granted the State's motion to determine voluntariness because
his right to counsel under the Sixth Amendment to the United
States Constitution was violated.

> We answer questions of constitutional law by exercising our
> own independent constitutional judgment based on the facts
> of the case.  Thus, we review questions of constitutional
> law under the "right/wrong" standard.  Pursuant to the
> right/wrong standard, a conclusion of law is not binding
> upon the appellate court and is freely reviewable for its
> correctness.  Moreover, findings of fact are reviewed under
> the "clearly erroneous" standard.  A finding of fact is
> clearly erroneous when, despite evidence to support the
> finding, the appellate court is left with the definite and
> firm conviction, in reviewing the entire record, that a
> mistake has been committed.

State v. Soto, 84 Hawaiʻi 229, 236, 933 P.2d 66, 73 (1997)
(citations and some internal quotation marks omitted).

Conklin cites two federal cases, United States v.
Danielson, 325 F.3d 1054 (9th Cir. 2003) and Williams v.
Woodford, 384 F.3d 567 (9th Cir. 2004),[4] in support of his
argument.  Both cases, and the other federal decisions discussed
in those cases, involved situations where government agents
(either undercover law enforcement officers or paid informants)
secretly obtained information from the defendant after the
defendant's Sixth Amendment right to counsel had attached.[5]  The
basic contours of the right to the assistance of counsel are
identical in state and federal contexts.  State v. Krause, 64
Haw. 522, 524 n.3, 644 P.2d 964, 967 n.3 (1982).

---

[4]    Conklin's opening brief incorrectly cites Williams v. Woodford,
306 F.3d 665 (9th Cir. 2002).  The Ninth Circuit issued an amended opinion
that superseded the one cited by Conklin.  The portion of the opinion
addressing the Sixth Amendment right to counsel was not amended.

[5]    The Sixth Amendment right to counsel attaches when the government
initiates criminal proceedings against a defendant.  See Maine v. Moulton, 474
U.S. 159, 170 (1985).

In <u>Krause</u>, the defendant (**Krause**) was indicted for a murder in Hawai'i, arrested in Alaska and held for extradition. While incarcerated, Krause made incriminating statements to another prisoner (**Wayne**). Wayne contacted the FBI about Krause's statements. Wayne was told that someone would get in touch with him, but he was not promised anything by the FBI. Krause eventually showed Wayne a map of where the victim was buried. Wayne provided the information to the FBI, leading to the discovery of the victim's body. During Krause's trial, Wayne testified about Krause's incriminating statements, including a confession. Krause was convicted. On appeal, the Hawai'i Supreme Court had to decide whether the admission of Wayne's testimony violated Krause's right to assistance of counsel. After discussing <u>Massiah v. United States</u>, 377 U.S. 201 (1964) (defendant made incriminating statements to co-defendant who was a government agent) and <u>United States v. Henry</u>, 447 U.S. 264 (1980) (defendant made incriminating statements to fellow inmate who was a paid informant), the supreme court stated:

> Since the rule of <u>Massiah</u> serves the purpose of preventing police interference with the relationship between a suspect and his counsel once formal proceedings have begun, the sixth amendment right to assistance of counsel is not violated in the absence of any governmental effort to elicit incriminating statements from the suspect. Thus, unless Wayne was a government agent, his conduct in jail did not constitute governmental action.

<u>Krause</u> at 524-25, 644 P.2d at 967 (citations omitted). In <u>Krause</u>, Wayne was not a government informant when Krause told him the details of the murder. Wayne learned and conveyed the location of the body after meeting with the FBI, but the FBI had not promised Wayne anything in exchange for more information. There was conflicting evidence about the existence of an agreement that the government would dismiss Wayne's criminal case if Wayne testified at Krause's trial, but the supreme court held that such an agreement would be irrelevant because even if it existed, it would have been "made after the informant had the information, and the informant was to receive his freedom for testifying instead of [for] eliciting information." <u>Id.</u> at 526, 644 P.2d at 968. Under those circumstances, the supreme court

held that "the incriminating statements were not 'deliberately elicited' within the meaning of <u>Massiah</u>, and thus the government did not violate [Krause's] sixth amendment right to assistance of counsel." <u>Id.</u>

Thus, <u>Krause</u> stands for the proposition that <u>covert</u> government attempts to obtain incriminating information from an indicted suspect violate the suspect's Sixth Amendment right to counsel. By contrast, <u>overt</u> government attempts to obtain incriminating information – such as custodial interrogation – implicate the Fifth Amendment. This case does not involve the State covertly attempting to obtain information from Conklin through the use of an undercover officer or a paid informant. Conklin knew that Officer Phillips was a police officer when he admitted lying to him. The Circuit Court properly analyzed the voluntariness issue as one implicating the Fifth Amendment rather than the Sixth Amendment. Officer Phillips testified, and it was not disputed, that Conklin initiated their conversation, he did not ask Conklin any questions about this case, Conklin was not in custody and not handcuffed, and they were at Conklin's residence. There was neither a Fifth Amendment nor a Sixth Amendment violation in this case.

### III.

For the foregoing reasons, the Judgment is affirmed.

DATED: Honolulu, Hawaiʻi, February 12, 2019.

On the briefs:

Edward J. Fetzer,
for Defendant-Appellant.

Mitchell D. Roth,
Prosecuting Attorney,
Anmar E. Alnagem,
Deputy Prosecuting Attorney,
County of Hawaiʻi
for Plaintiff-Appellee.

Chief Judge

Associate Judge

Associate Judge